DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America
By:     ELLEN BLAIN
        DAVID J. KENNEDY
        JACOB LILLYWHITE
        CHRISTINE S. POSCABLO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone (212) 637-2733
Facsimile (212) 637-0033
david.kennedy2@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement Section
R. TAMAR HAGLER
Deputy Chief
JUNIS L. BALDON
HARIN C. SONG
KINARA A. FLAGG
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 353-1339
Fax: (202) 514-1116

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>         v.<br><br>META PLATFORMS, INC., f/k/a<br>FACEBOOK, INC.,<br><br>       Defendant. | COMPLAINT<br><br><br>22 Civ. _____ (____)<br><br><br><br>Jury Trial Demanded |

**INTRODUCTION**

1.      The United States of America brings this action against Meta Platforms, Inc., f/k/a

Facebook, Inc. ("Facebook") to enforce the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619,

which prohibits discrimination in housing, including housing-related advertising, on the basis of

race, color, religion, sex, disability, familial status, and national origin (collectively, "FHA-

protected characteristics").  For years, Facebook has discriminated against its users on the basis

of these FHA-protected characteristics in its delivery of housing advertisements ("ads").

2.      As alleged more fully below, Facebook has discriminated in violation of the FHA

in at least three aspects of the ad delivery system Facebook designed and provides to advertisers:

(1) **Trait-Based Targeting**—encouraging advertisers to target ads by including or excluding

Facebook users based on FHA-protected characteristics that Facebook, through its data

collection and analysis, attributes to those users; (2) **"Lookalike" Targeting**—designing,

maintaining, applying, and making available to advertisers a machine-learning algorithm to find

users who "look like" an advertiser's "source audience" based in part upon FHA-protected

characteristics, through a Facebook tool previously called "Lookalike Audience" and now known

as "Special Ad Audience"; and (3) **Delivery Determinations**—designing, maintaining, and

applying machine-learning algorithms ("Personalization Algorithms") to help determine which

subset of the advertiser's targeted audience (the "Eligible Audience") will actually receive the ad

(the "Actual Audience"), based in part upon FHA-protected characteristics.  By creating

targeting tools to define the "Eligible Audience" in part by FHA-protected characteristics,

Facebook enabled advertisers to categorically exclude protected groups from even being

considered eligible to receive certain housing ads.  By designing, maintaining, applying, and

making available to advertisers an algorithm that finds users who "look like" an advertiser's source audience based in part on FHA-protected characteristics, Facebook continues to exclude users from receiving certain housing ads based on users' FHA-protected characteristics. And by designing, maintaining, and applying algorithms that use FHA-protected characteristics to help determine who from the Eligible Audience actually receives housing ads, Facebook continues to exclude even "eligible" users from receiving information about housing opportunities.

3.      First, until at least 2019, Facebook enabled and encouraged advertisers—including advertisers proposing housing-related ads covered by the FHA—to use Facebook-created categories of characteristics to target to or to exclude Facebook users from the Eligible Audience for an ad. Some of those Facebook-created categories were based on users' FHA-protected characteristics or on characteristics that are proxies for, or closely related to, FHA-protected categories. Facebook made some changes to this aspect of its ad delivery system in September 2019 as part of settling FHA claims brought by civil rights groups in this Court. *See National Fair Housing Alliance, et al. v. Facebook, Inc.*, 18 Civ. 02689 (JGK) (S.D.N.Y.) ("NFHA Lawsuit").

4.      Second, Facebook invites advertisers to use its proprietary tool called "Lookalike Audiences." Facebook employs a machine-learning algorithm to analyze an advertiser's own identified audience, the "source audience," and create a "Lookalike Audience" of additional Facebook users who Facebook determines have demographics, interests, or other characteristics in common with an advertiser's source audience. Using the algorithm, Facebook identifies users who it determines most "look like" the source audience as potential targets to receive the ad and excludes users who it determines are not similar enough to the advertiser's "source audience," which is explained more fully below. Until at least 2019 for housing advertisements, Facebook

identified "lookalike" users by considering FHA-protected characteristics like users' self-reported sex and religion in its Lookalike Audience tool to help determine whether a user "looked like" the advertiser's source audience. In 2019, Facebook modified this tool for housing ads by limiting the data that the machine-learning algorithm can use, but even the modified tool continues to construct Lookalike Audiences for housing ads based in part upon FHA-protected characteristics, including but not limited to sex.

5. Third, Facebook discriminates against users on the basis of FHA-protected characteristics through the design, maintenance, and application of its Personalization Algorithms. Facebook uses the Personalization Algorithms as part of deciding which subset of an advertiser's Eligible Audience will actually receive an ad. Specifically, Facebook designed and implemented its Personalization Algorithms to predict which Facebook users will be most likely to click on, or otherwise interact with, an ad. That prediction significantly affects whether a user will see an ad. To make that prediction, Facebook provides the Personalization Algorithms with Facebook's massive trove of user data containing, encoding, or reflecting users' protected characteristics (or information closely related to, or proxies for, those characteristics). When an FHA-protected characteristic is predictive of user engagement with certain ads, Facebook's Personalization Algorithms are designed to determine relevance based, in part, on that characteristic. Facebook's use of these algorithms also has an unlawful disparate impact on users by disproportionately steering certain housing ads away from users because of FHA-protected characteristics such as race.

6. It has been widely known—including at Facebook—that machine-learning processes like the Personalization Algorithms are susceptible to taking actions or producing effects that are unlawful when deployed in areas covered by the FHA or other civil rights laws.

Despite that awareness, Facebook designed and has maintained its ad delivery system in a way that produces discriminatory outcomes, and Facebook has failed to adequately identify, avoid, mitigate, or cure the discriminatory outcomes of its system.

7.     The United States files this action pursuant to 42 U.S.C. § 3612(o) following an investigation and charge of discrimination by the U.S. Department of Housing and Urban Development ("HUD"), and an election by Facebook to proceed in federal district court.

8.     The United States also brings this action under 42 U.S.C. § 3614(a) because Facebook, through its ad delivery system, has engaged in a pattern or practice of prohibited discrimination. Facebook's ad delivery system also has denied rights to a group of persons and such denial raises an issue of general public importance under 42 U.S.C. § 3614(a).

**DEFENDANT**

9.     Facebook is a social media company incorporated in Delaware that has its corporate headquarters in Menlo Park, California, and an office in New York City.

10.     Facebook operates a number of web- and mobile-device-based platforms through which users can share information about themselves and on which users can view content (including advertisements) arranged or chosen for the user by Facebook.

11.     Facebook, through its advertising system, enables advertisers to create audiences for their ads, and then Facebook delivers ads to users on its platforms and on Facebook-owned mobile applications ("apps"), such as Facebook, Instagram, and Messenger, as well as third-party apps enrolled in Facebook's Audience Network.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1345 because it arises under the laws of the United States and the United States brings this case as a plaintiff.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(a)-(b) because Facebook conducts business and delivers ads for housing and related services to millions of Facebook users within this judicial district.

## FACTUAL ALLEGATIONS

### I.     Facebook's Ad Delivery System

#### A.     Background

14.     Facebook has over 223 million monthly active users in the United States.

15.     Facebook's website and apps allow anyone willing to provide their full name, sex (or preferred gender pronoun), cellphone number or email address, and birthday to create a user profile.

16.     Facebook users can find other users—*e.g.*, individuals, businesses, or other entities—and designate them as "friends," which allows users to more easily see each other's information, including news stories and videos.

17.     Facebook users also can join "Facebook Groups," which encourages users to share content related to a particular subject with other users who have joined that group.

18.     Facebook delivers ads to its users in a variety of ways, one of which is a user's "News Feed." Upon logging into Facebook, a user first sees a personalized "News Feed" page, which shows material that the user or the user's friends have posted to Facebook.

19.     Ads from different vendors, including housing-related ads, are interspersed within the News Feed.  As a user scrolls up or down the News Feed, Facebook chooses and periodically places ads among or alongside content posted by the user's friends.

20.     Advertising to users is the core of Facebook's business model.  In 2021 Facebook received approximately $114.9 billion in revenue from advertising.

21.     Facebook generates revenue by designing and using various tools to target ads to Facebook users and then delivering ads to users that Facebook's Personalization Algorithms predict will find the ads relevant.

22.     Facebook claims that it excels at matching ads to particular users through ad-targeting criteria and by predicting which users will find an ad most relevant.  Facebook is able to tout its skill to target ads to users because of two things: (1) the vast amount of information Facebook collects and infers about users' characteristics, up-to-date interests, and similarities or connections with other users; and (2) Facebook's Personalization Algorithms, which allow Facebook to steer ads toward users it predicts, based on its vast amount of data, are most likely to engage with the ad.

**B.     Facebook's Collection of User Data**

23.     Facebook uses data it has collected and inferred about its users to attribute particular behaviors, interests, and demographics to those users.  Facebook collects this data from several sources, including (1) information users must provide when signing up to use Facebook, (2) user profiles, (3) users' memberships in Facebook Groups, (4) users' creation of an "avatar" of themselves, (5) users' activity on Facebook, (6) users' activity elsewhere, including offline activity, and (7) similar information about users' "friends" on Facebook or Facebook-owned platforms.  Each of these sources of user data is explained in greater detail in

Paragraphs 24 through 33 of this Complaint. As explained below, Facebook uses its vast amount of user data to classify the entire universe of its users into various categories—including by demographics, interests, and other characteristics—and then uses those classifications as a key element of its ad delivery system.

24. When individuals sign up for a Facebook account they must reveal their sex (or preferred gender pronouns) as a condition of accessing the site. Thus, from the first interaction with its users, Facebook has data about users' sex (or preferred gender pronoun), and Facebook uses that information as part of its ad delivery system.

25. Facebook also invites and encourages users to provide additional information in their Facebook profile, including, for example, a profile photo, religious views or affiliation, family members, and relationship status. Facebook uses this profile information in its ad delivery system.

26. Facebook also collects information about users' membership in user-created Facebook Groups. The names of some of these groups refer directly to characteristics protected under the FHA, including race and gender (*e.g.*, "Single Black Mothers" or "Asian Single Women"), national origin (*e.g.*, "United Latino Professionals"), religion (*e.g.*, "Jewish Americans" or "United Muslims"), familial status (*e.g.*, "Mothers of Young Children" or "Parents with Toddlers Support Group"), and disability (*e.g.*, "Parents in Wheelchairs" or "Person with Disability (PWD)"). Facebook uses information about users' membership in Facebook Groups as part of its ad delivery system.

27. Facebook also invites and encourages Facebook users to create their "avatar," selecting their skin color, eye shape, nose and lip shapes, and hair type or style. The following images from Facebook's website show how the avatar creation works.







28.     When the user is selecting the shape of the user's eyes, nose, and lips through the Facebook app, Facebook invites the user to open a "mirror" to display a feed from the user's device's front camera next to the avatar to help the user pick the best-matching facial features. For example:



29.    This information concerning the user's physical appearance becomes part of Facebook's enormous set of user data.

30.    Facebook collects information about users' activity on Facebook and other Facebook-owned platforms, including Instagram, Messenger, and WhatsApp, including which accounts users follow or visit, and what content each user "likes" or shares with other users. Facebook uses information about users' activity on its platforms as part of its ad delivery system.

31.    Facebook collects information about users' online activity on websites or apps that are not owned by Facebook, including the content the user visited or "liked." Facebook uses information about users' activity on other websites or apps as part of its ad delivery system.

32.    Facebook also collects information about users' offline activity, such as geo-location data and purchases at or visits to brick-and-mortar stores, restaurants, or events. Facebook uses information about this offline activity as part of its ad delivery system.

33.    Facebook's design as a social network means that Facebook's collection of data about each particular user includes information about the user's connected "friends," those individuals' sex (or preferred gender pronouns), user profiles, memberships in Facebook Groups,

"avatar" of themselves, activity on Facebook and other Facebook-owned platforms, activity elsewhere online, and data about offline activity. Facebook uses information about users' "friends" and connections as part of its ad delivery system.

      **C.**     **Facebook's Analysis of User Data to Create and Deploy Its Advertising Tools**

      34.     Using the vast amounts of data it has about its users, Facebook uses machine learning to create, maintain, and provide a curated list of demographics, interests, and other characteristics for advertisers to choose from in targeting an ad. Facebook encourages advertisers to use its categories, asserting that they allow advertisers to identify the users most likely to find a given ad relevant. The available options, which Facebook changes as it sees fit, include categories that constitute FHA-protected characteristics or are proxies for or closely related to such characteristics.

      35.     For example, Facebook makes users' sex—an FHA-protected characteristic— available to advertisers for ad targeting. And, until 2019, advertisers with housing-related ads were allowed to use that targeting feature, including to exclude users from an ad's Eligible Audience based on sex.

      36.     Facebook's classifications of users for the purpose of targeting and delivering ads also include categories that explicitly refer to users' familial status,[1] another FHA-protected

---

[1] The FHA defines "familial status" as:

     one or more individuals (who have not attained the age of 18 years) being domiciled with — (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person. The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process

characteristic. Among the Facebook-created classifications that reveal users' familial status are: "parents with toddlers (01-02 years)," "New Moms," "parents with preschoolers (03-05 years)," "Moms of preschool kids," "parents with early school-age children (06-08 years)," "Moms of grade school kids," "parents with preteens (08-12)," "parents with teenagers (13-18)," "Moms of high school kids," and "Moms of high school students."

37. Facebook's classifications of users for the purpose of targeting and delivering ads include, or have included in the recent past, categories that are either proxies for, or closely related to, additional FHA-protected characteristics, including race, national origin, religion, and disability.

38. For example, Facebook has classified some of its users by what it characterizes as their "multicultural affinity," which Facebook previously called "ethnic affinity." Facebook has created and deployed six "multicultural affinity" classifications: "African American (US)," "Asian American (US)," "Hispanic (US—All)," "Hispanic (US—Bilingual: English and Spanish)," "Hispanic (US—English Dominant)," and "Hispanic (US—Spanish dominant)." Facebook has touted the use of its "multicultural affinity" feature as an effective way to target ads to people of specific races or ethnicities.

39. Facebook also categorizes some of its users as having an "interest" in particular religions or religious topics, including "Judaism," "Orthodox Judaism," "Jewish culture," "Jewish holidays, "Islam," "Shia Islam," "Sunni Islam," "Islamic theology," "Christian," "Catholicism," or "Hinduism."

---

of securing legal custody of any individual who has not attained the age of 18 years.

42 U.S.C. § 3602(k).

40. Moreover, Facebook classifies some of its users as having an "interest" in various disability-related topics or groups, including "Guide Dogs for the Blind," "service animal," "special education," "Wheelchair ramp," "American Sign Language," "Autistic Self Advocacy Network," "Disabled American Veteran," "Disabled Parking Permit," or "Disability.gov."

## II. Three Aspects of Facebook's Ad Delivery System That Violate the FHA

41. As previously noted, this Complaint alleges unlawful discrimination in three aspects of Facebook's ad delivery system: (1) Trait-Based Targeting—encouraging advertisers to target ads by including or excluding Facebook users based on demographics, interests, or other FHA-protected characteristics that Facebook, through its data collection and analysis, attributes to those users; (2) "Lookalike" Targeting—designing, maintaining, applying, and making available to advertisers a machine-learning algorithm to find users who "look like" an advertiser's source audience, based in part upon FHA-protected characteristics, through a Facebook tool called "Lookalike Audience"; and (3) Delivery Determinations—designing, maintaining, and applying machine-learning algorithms ("Personalization Algorithms") to help determine which subset of the advertiser's targeted audience (the "Eligible Audience") will actually receive the ad (the "Actual Audience"), based in part upon FHA-protected characteristics.

### A. Facebook's Trait-Based Targeting to Create an Eligible Audience for an Ad

42. Facebook offers advertisers an interactive tool called "Ads Manager," which allows an advertiser to upload a proposed ad and use various Facebook-created features and tools to ask Facebook to create an Eligible Audience for the ad.

43. Facebook controls the ad targeting options available to advertisers. Despite the fact that Facebook removed some targeting options for housing ads in 2019, Facebook can still

remove, change, or limit the ad targeting options available to advertisers, and it has done so at times relevant to this action. It can limit or modify the ad targeting options specifically available to advertisers seeking to deliver housing-related ads.

44.     Using Ads Manager, the advertiser defines the ad's Eligible Audience by using drop-down menus generated by Facebook, which allow an advertiser to select users for the Eligible Audience by their demographics, interests, and other characteristics, including FHA-protected characteristics or proxies for such characteristics.

45.     Facebook's Ads Manager includes a "Detailed Targeting" feature. As part of Detailed Targeting, Ads Manager prompts advertisers to search for "demographics, interests[,] or behaviors" that will match up with users identified by Facebook. At least until 2019, Facebook allowed housing advertisers to target ads through Ads Manager using Facebook's "multicultural affinity" classification of users, which was available to advertisers under the "demographics" targeting option in Facebook's "Detailed Targeting" feature of Ads Manager.

46.     As a potential advertiser uses Facebook's Ads Manager tool, Facebook provides real-time recommendations and feedback about the Eligible Audience that will result.

47.     Using Facebook's curated categories, advertisers can craft the ad's Eligible Audience to *include* users that, according to Facebook, match particular "demographics, interests[,] or behaviors."

48.     Facebook's "Detailed Targeting" options also allow advertisers to *exclude* users from the Eligible Audience based on "demographics, interests[,] or behaviors" that Facebook provides to the advertisers. At least until 2019, Facebook allowed advertisers to use its Detailed Targeting feature to exclude users from Eligible Audiences for housing-related ads based on certain characteristics protected by the FHA.

49.     These Detailed Targeting options included targeting based on Facebook's "multicultural affinity" classification of users.  When confronted with allegations that its "multicultural affinity" targeting allowed housing advertisers to exclude users from housing opportunities based on their race or ethnicity, Facebook has claimed that "multicultural affinity" is not meant to track users' race or ethnicity, but rather their "interest" in a particular race or ethnicity.

50.     But Facebook itself has repeatedly described its "multicultural affinity" ad targeting as race- or ethnicity-based.  For instance, during a panel discussion in March 2016, a Facebook executive explained that the company's ad delivery system "ha[s] a multicultural cluster that knows who is in the African American demographic or US Hispanic or the general population," and that Facebook has used this tool to help advertisers deliver targeted, separate ads to African American, Hispanic, and White audiences.[2]  Similarly, in an October 28, 2016 post entitled, "Driving Relevance and Inclusion with Multicultural Marketing," Facebook gave an example of how Ads Manager could help advertisers specifically target ads to Black women users on Facebook.[3]  More generally, in a 2015 earnings call, a Facebook executive stated that by "[u]sing Facebook and Instagram ads you can target by congressional district, you can target by interest, you can target by demographics or any combination of those." (*See* Harry Davies & Danny Yadron, *How Facebook tracks and profits from voters in a $10bn US election*, The Guardian, Jan. 28, 2016.)

---

[2] The audio of the discussion is available at https://soundcloud.com/officialsxsw/big-box-office-marketing-films-in-a-mobile-world-sxsw-interactivefilm-2016, at 28:00–29:30.

[3] https://www.facebook.com/business/news/driving-relevance-and-inclusion-with-multicultural-marketing.

51.     *Targeting Based on Sex*:  Prior to 2019, Facebook provided housing-related advertisers a toggle button that allowed them to exclude all female users or all male users from the Eligible Audiences for ads.  That feature is still available for ads that are not identified by the advertiser or by Facebook as related to housing, credit, or employment.

a. In January and February 2018, for example, Facebook approved requests from would-be housing advertisers to include only men or only women in the Eligible Audiences, thereby excluding all Facebook users of a particular sex from seeing the housing ads.

b. HUD's investigation confirmed that Facebook allowed advertisers to exclude all men or all women from the Eligible Audience for a housing ad.  As part of its investigation, HUD tested the "Ads Manager" tool and was able to exclude women from a proposed ad audience by simply selecting "men" on the gender toggle button in Ads Manager.  At no point during the ad creation process did Facebook alert HUD that the test ads, if posted, would violate the FHA or Facebook's anti-discrimination policies.

52.     *Targeting Based on Familial Status*:  Facebook approved ads in which the would-be advertisers excluded users based on their familial status.

a. In November 2017, for example, Facebook approved ads for rental housing for which the advertisers asked Facebook to exclude users from the Eligible Audience if they were classified as "Moms," "New Moms," "Moms of preschool kids," "Moms of grade school kids," "Moms of high school kids," and "Parents (All)."

b. Facebook's approval of these ads was widely publicized, and Facebook was aware of it no later than November 29, 2017, when it claimed it had addressed the issue.

c. Nonetheless, in January and February 2018, Facebook approved housing ads in which would-be housing advertisers asked Facebook to exclude from the Eligible Audience those Facebook users in the following demographic groups: "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with preteens (08-12)," and "parents with teenagers (13-18)."

d. HUD's investigation also showed that Facebook allowed advertisers to exclude users based on their familial status. As part of its investigation, HUD tested the "Ads Manager" tool and was able to exclude users whom Facebook had classified as a member of the "Mommy" demographic. At no point during the ad creation process did Facebook alert HUD that the test ads, if posted, would violate the FHA or Facebook's anti-discrimination policies.

53. At least prior to 2019, Facebook also allowed advertisers to exclude users from seeing housing-related ads based on classifications that are proxies for, or closely related to, FHA-protected characteristics.

54. *Targeting Related to Race and National Origin*: Facebook has approved ads in which the would-be advertisers excluded users based on classifications that are proxies for, or at least closely related to, race and national origin.

a. As early as October 2016, Facebook approved housing-related ads for which advertisers had excluded from the Eligible Audience those users whom

Facebook characterized as having an "African American (US)," "Asian American (US)," or "Hispanic (US—Spanish dominant)" "ethnic affinity."

b.  Facebook acknowledged in November 2016 that its ad delivery system allowed housing advertisers to use "ethnic affinity marketing," but claimed that it would disable that feature for housing-related ads.

c.  In February 2017, Facebook claimed that it "would build an automated system to spot ads that discriminate illegally." As part of that automated system, Facebook stated that it would require housing advertisers "to 'self-certify' that their ads were compliant with anti-discrimination laws."

d.  Sometime between November 2016 and November 2017, Facebook changed the "ethnic affinity" label to "multicultural affinity" in its Detailed Targeting function, but these classifications otherwise remained the same.

e.  Despite Facebook's pledges to stop the discrimination, Facebook approved rental housing ads in November 2017 in which the advertisers asked Facebook to exclude from the Eligible Audience the users whom Facebook classified as having one of the following "multicultural affinities": "African American (US)," "Asian American (US)," "Hispanic (US—Spanish dominant)," or "Hispanic (US—Bilingual)."

f.  HUD's investigation found similar results. As part of its investigation, HUD tested the "Ads Manager" tool and was able to exclude from the Eligible Audience for a housing ad those users whom Facebook classified as having an "African American (US)" "multicultural affinity." At no point during the ad

creation process did Facebook alert HUD that the test ads, if posted, would

violate the FHA or Facebook's anti-discrimination policies.

55.     *Targeting Related to Religion*:  Facebook has approved ads in which the would-be
advertisers excluded users based on classifications that are proxies for, or closely related to,
religion.

      a.   In November 2017, for example, Facebook approved rental housing ads in

which the advertisers asked Facebook to exclude from the Eligible Audience

those users whom Facebook had classified as having an "interest" in certain

religions or religious topics, including "Judaism," "Hasidic Judaism,"

"Orthodox Judaism," "Conservative Judaism," "Reform Judaism," "The

Jewish Home," "Shia Islam," "Sunni Islam," "Catholicism," "Protestantism,"

"Bible," "Christianity," "Christian," "Lutheranism," or "Jesus."

      b.   HUD's investigation found similar results.  As part of its investigation, HUD

tested the "Ads Manager" tool and was able to exclude from the Eligible

Audience for housing ads those users whom Facebook had classified as

having an interest in Islam, Hinduism, and Judaism.  At no point during the ad

creation process did Facebook alert HUD that the test ads, if posted, would

violate the FHA or Facebook's anti-discrimination policies.

56.     *Targeting Related to Disability*:  Facebook has approved ads in which the would-
be advertisers excluded users based on classifications that are proxies for, or closely related to,
disability.

      a.   In November 2017, Facebook approved rental housing ads in which the

advertisers asked Facebook to exclude from the Eligible Audience those users

whom Facebook had classified as having an "interest" in "Braille," "The Guide Dogs for the Blind Association," "Guide Dogs for the Blind," "Wheelchair accessible van," "Wheelchair ramp," or "American Sign Language."

b. In January and February 2018, Facebook approved housing ads in which would-be housing advertisers asked Facebook to exclude from the Eligible Audience those Facebook users whom Facebook classified as having an "Interest in Disabled American Veteran," "Interest in Disabled Parking Permit," or "Interest in Disability.gov."

c. HUD found that it was able to exclude from the Eligible Audience those Facebook users whom Facebook classified as having an interest in topics such as "service animal," "special education," or the "Autistic Self Advocacy Network." At no point during the ad creation process did Facebook alert HUD that the test ads, if posted, would violate the FHA or Facebook's anti-discrimination policies.

57. Facebook's approvals of these discriminatory ads were published in news reports, were alleged in the NFHA Lawsuit, and were summarized by HUD in determining that Facebook violated the FHA. Facebook was aware of these reports that it approved these discriminatory ads.

58. In the NFHA Lawsuit, which was filed in March 2018, several civil rights organizations alleged that Facebook's ad delivery system violated the FHA as well as other civil rights laws, including by creating and providing ad targeting options (such as those described above) in connection with ads relating to housing. The parties resolved the NFHA Lawsuit with

a settlement agreement filed with and entered by this Court in March 2019.  As part of the settlement, Facebook agreed to remove certain discriminatory targeting options for housing, employment, and credit advertisers.

59.     Although Facebook has made some changes to the targeting options available for housing, credit, and employment ads, these changes have been insufficient to stop discriminatory ad targeting.  As alleged above, *after* Facebook had claimed that it changed its system to address discriminatory ad targeting, would-be advertisers still were able to select targeting options Facebook claimed it had removed.  In April 2021, advertisers were able to target credit ads using targeting options that Facebook had previously claimed were prohibited.  Facebook still has no effective mechanism to ensure that it properly identifies housing advertisements and that targeting options based on FHA-protected characteristics are not available for such ads.  Thus, Facebook's purported changes to date have been insufficient to stop discriminatory ad targeting, and those changes could be easily reversed.

60.     Facebook, through its design and its use of ad targeting categories based on user demographics or other characteristics, has intentionally discriminated on the basis of race, color, religion, sex, disability, familial status, and national origin.  Until recently, Facebook intentionally relied on information about, or closely related to, users' FHA-protected characteristics to create its ad targeting categories and also to identify users to include in or exclude from ad audiences.  Facebook encourages, facilitates, and implements discriminatory decisions by advertisers to exclude users from Eligible Audiences.  Facebook intentionally created user categories based upon protected characteristics and acquiesced in, and was deliberately indifferent to, discriminatory decisions by advertisers to exclude users from Eligible Audiences using Facebook's tools.

61.     Facebook's design and its use of ad targeting categories based on user demographics or other characteristics have a disparate impact on the basis of FHA-protected categories on users' opportunities to see housing-related ads.  The way Facebook designed and uses ad targeting categories based on, or closely related to, FHA-protected characteristics in connection with housing-related ads is neither justified by business necessity nor necessary to achieve any substantial, legitimate, nondiscriminatory interests.  Even if it were, Facebook could achieve its interests in maximizing its revenue and providing relevant ads to users through less discriminatory means.

**B.     Discrimination in Creating the "Lookalike Audience"**

62.     With the Lookalike Audience tool, Facebook must first create a "source audience" through its Custom Audience option.  Facebook can create a Custom Audience in one of four ways.  Specifically, the advertiser selects one among the following options:

a.  Website Custom Audience: if the advertiser has embedded a Facebook "pixel" in the advertiser's website, Facebook tracks activity on that site and can create a Custom Audience of users who have, among other things, recently visited the site;

b.  App Custom Audience: if the advertiser uses Facebook's software development kit to share data from the advertiser's app with Facebook, Facebook can create a Custom Audience of users who have installed the advertiser's app or engaged with it in a particular way;

c.  Personal Identifier Custom Audience: the advertiser can send to Facebook personally identifiable information, such as email addresses, phone numbers,

or home addresses, of those it would like to target ads to, to the extent they are users of Facebook platforms;

d. Engagement Custom Audience: Facebook can create a Custom Audience of users who have engaged with the advertiser's content on Facebook or Instagram.

Facebook's creation of a Custom Audience using the first three methods requires an additional step. Facebook must match the information used to identify the Custom Audience—the data Facebook collects from its pixel (for a Website Custom Audience), from the data individuals provide to the advertiser's app (for an App Custom Audience), or from the personally identifiable information provided by the advertiser (for a Personal Identifier Custom Audience)—against the data Facebook has collected about the users of Facebook platforms to identify the users who match the criteria for the Custom Audience. Once the advertiser selects one of these four options, that pool of Facebook users forms the source audience.

63. Next, the advertiser can then direct Facebook to either deliver the housing ad exclusively to the users in the source audience, or deliver the housing ad to users who "look like" the source audience.

64. To identify users who most "look like" the source audience, Facebook employs a machine-learning algorithm. As Facebook explains: "A lookalike audience uses an existing Custom Audience you select for its source audience. To create a lookalike audience, our system leverages information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities. When you use a lookalike audience, your ad is delivered to that audience of people who are similar to (or 'look like') your existing customers."[4]

---

[4] https://www.facebook.com/business/help/164749007013531.

65.     Typically, the "Lookalike Audience" is significantly larger than the source audience provided by the advertiser.  For example, an advertiser might provide to Facebook the personally identifiable information of its 100 best customers to serve as the source audience, and Facebook would use its machine-learning algorithm to analyze the source audience with the objective of creating a Lookalike Audience of many more Facebook users who would be potential targets to receive the ad.

66.     Facebook designed the machine-learning algorithm that it uses to create Lookalike Audiences.  Facebook can choose what data it gives the algorithm in order to analyze the advertiser's source audience and to seek out the additional Facebook users who "look like" the source audience.  In a 2014 earnings call, a Facebook executive explained that the purpose of the Lookalike Audience tool was to identify "customers who share characteristics, age, demo[graphic]s, likes, interests with current customers."

67.     Facebook acknowledged in 2018 and 2019 that the Lookalike Audience tool used the demographics of its users—including race, sex, religions, age, zip codes, and Facebook Group membership, among other categories—in selecting the Lookalike Audiences to whom to deliver ads.

68.     As part of the NFHA settlement, Facebook agreed that by September 2019 it would no longer consider users' sex, religious views, Facebook Group membership, age, and zip code as part of its Lookalike Audience tool for housing, credit, and employment ads.  For these types of ads, Facebook agreed to design a new version of the "Lookalike Audience" tool, now called "Special Ad Audience."  Facebook claimed that its Special Ad Audience tool would "not consider age, gender, relationship status, religious views, school, political views, interested in [*sic*], or zip code."

69.     Despite Facebook's pledge, testing has revealed that the "Special Ad Audience" tool generated audiences based, at least in part, on sex for housing, credit, and employment ads. The testing showed, for example, that where an advertiser included only men in its source audience, the group of users to whom the old version of the Lookalike Audience tool delivered the ad was 99% male.  The results were almost as stark when the advertiser used the new Special Ad Audience tool for its all-male source audience.  Applying that new tool, Facebook still delivered the ad to an audience that was more than 95% male.  This result occurred despite Facebook's representation that its Special Ad Audience tool does not use age, gender, and other demographics, behaviors, or interests.  Facebook is aware of these results, which were published in an academic paper in December 2019.

70.     Facebook was aware that removing certain variables from its algorithms likely would not correct the discriminatory ad delivery resulting from Facebook's Lookalike Audience tool.  Specifically, Facebook employees acknowledged in 2018 that removing protected characteristics as inputs to Facebook's algorithm was insufficient, because its algorithm would nevertheless skew delivery along the lines of protected characteristics.

71.     Facebook, through its design and its use of the Lookalike Audience and Special Ad Audience tools, intentionally discriminates based upon FHA-protected characteristics such as sex.  Before 2019, Facebook elicited among other things the sex of its users and input that information into the Lookalike Audience tool.  After 2019, while Facebook no longer directly inputs this information into its Special Ad Audience and Lookalike Audience tools, Facebook continues to rely upon its vast trove of user data to create the audiences for housing ads.  FHA-protected characteristics are related to and encoded within this user data.

72.    Facebook's design and use of the Lookalike Audience and Special Ad Audience tools have an unlawful disparate impact on users' opportunity to see housing-related ads, at least based on sex.  The way Facebook designed and uses these tools in connection with housing-related ads is neither justified by business necessity nor necessary to achieve any substantial, legitimate, nondiscriminatory interests.  Even if it were, Facebook could achieve its interests in maximizing its revenue and providing relevant ads to users through less discriminatory means.

**C.    Discriminating Through the Design and Use of the Personalization Algorithms**

73.    After helping the advertiser create the Eligible Audience for an ad, Facebook uses the Personalization Algorithms, i.e., machine-learning algorithms, to help determine which subset of users in the advertiser's Eligible Audience will receive the ad.

74.    To determine which ad to deliver to a user at a given time, Facebook holds an automated auction by combining, for each ad for which a user is in the Eligible Audience, (a) the likelihood the user will engage with that ad as calculated by the Personalization Algorithms (what Facebook calls the user's "estimated action rate")[5]; (b) that advertiser's bid; and (c) what Facebook calls "ad quality," which includes a personalization component from some of the Personalization Algorithms. The ad with the highest total wins the auction and is delivered to the user.

75.    Facebook has explained that the Personalization Algorithms "use[] an ad auction and machine learning to determine where, when and to whom we show your ads. These processes work together to maximize value for both people and businesses."[6]  Facebook also

---

[5] https://www.facebook.com/business/help/430291176997542.

[6] https://www.facebook.com/business/help/1636814289727946.

explains that the Personalization Algorithms and its ad delivery system overall become more efficient at delivering ads the more an ad is shown to users. *Id.* In this way, Facebook "determine[s] the best ad to show a [Facebook user] at a given point in time."[7]

76. Facebook uses the Personalization Algorithms to help determine whether a particular group of users will see an ad. Facebook then steers ads away from certain users that the Personalization Algorithms predict are unlikely to find an ad "relevant," and conversely steers an ad toward other users who are more likely to find the ad "relevant."

77. Facebook has designed the Personalization Algorithms to match ads to users based on the algorithms' predictions about which users will find the ad relevant and whether those users are likely to interact with the ad in the manner desired by the advertiser—for example, by clicking a link in the ad, purchasing the advertised product, or sharing the ad with friends. Based upon these predictions, Facebook's ad delivery system steers ads that Facebook predicts to be most relevant to a user toward that user; and steers ads that Facebook predicts to be less relevant to a user away from that user. In this way, Facebook excludes certain users—all of whom are within the advertiser-defined Eligible Audience for the ad—from seeing that ad. Facebook has explained that "[t]argeting broadly essentially means that [an advertiser is] mostly relying on [Facebook's] delivery system to find the best people to show [an] ad to."[8] Using these predictions, Facebook delivers an ad to users until the advertiser's budget is exhausted.

78. Facebook intentionally makes available to its Personalization Algorithms all of the data that Facebook has gathered about its users. The user data that Facebook makes available

---

[7] https://www.facebook.com/business/help/430291176997542.

[8] https://www.facebook.com/business/help/308474373366888.

to its algorithms includes information not only about the user, but also the user's Facebook friends and those friends' user data.

79. This user data includes characteristics that are protected by the Fair Housing Act, including race, color, religion, sex, disability, familial status, and national origin. In 2018, for example, Facebook acknowledged that race and sex were among the variables that the company used in its Personalization Algorithms. Facebook knows its users' sex because users are required to disclose their sex (or preferred gender pronouns) as a condition of using the website. Facebook knows the religion and familial status of those users who voluntarily provide that information in their Facebook profiles. Facebook also knows the race or color of users based on its massive trove of user data, and encourages users to create an avatar showing skin color, hair type, and shape of the eyes, nose, and lips. The user data that Facebook makes available to the algorithms includes users' membership in Facebook Groups, some of which have names indicating their members' race, color, religion, sex, disability, familial status, or national origin. *See* Paragraph 26, *supra* (citing examples of such groups, including "Single Black Mothers," "United Latino Professionals," "Jewish Americans," "Mothers of Young Children," and "Parents in Wheelchairs").

80. By making available to the Personalization Algorithms the type of information listed in Paragraph 79, Facebook intentionally designed an ad delivery process that allows its algorithms to take FHA-protected characteristics into account to predict which users will be most likely to click on, tap, or otherwise engage with a housing ad, and in determining which users will receive ads.

81. As part of using the Personalization Algorithms to make ad delivery decisions, Facebook makes available to the algorithms the same data that underlies Facebook's

classification of users for ad targeting. For example, Facebook provides the Personalization Algorithms with data underlying Facebook's classification of users' multicultural affinity (closely related to race and national origin); "interest" in particular religions (closely related to a user's religion); and "interest" in various disability-related topics such as disability organizations, physical accessibility issues, and devices or mechanisms commonly used by people with disabilities (closely related to a user's disability). Thus, Facebook's design of and reliance on its Personalization Algorithms allow consideration of data reflecting characteristics that are proxies for, closely related to, or direct descriptors of FHA-protected characteristics.

82. The user data that Facebook makes available to its Personalization Algorithms contains pre-2019 information about users' engagement with housing ads. In other words, the Personalization Algorithms have access to user data from the time period before the NFHA settlement, a time period when Facebook created and offered tools and targeting categories that expressly reflected FHA-protected characteristics or their proxies. Discriminatorily excluding someone from seeing housing ads diminishes that person's opportunity to demonstrate interest in such ads, for the simple reason that users cannot click on ads they never receive. As a result, Facebook's Personalization Algorithms likely will underestimate previously excluded users' interest in housing ads based on those users' lack of pre-2019 clicks, reducing the likelihood that those users would receive housing ads even after the changes that Facebook claims to have made in 2019. At the same time, other users who were *not* excluded were able to demonstrate an interest by clicking on the ads they received, thus increasing the likelihood that the Personalization Algorithms would identify those users as interested in housing ads after 2019. The information that Facebook feeds into its Personalization Algorithms is thus tainted by the pre-2019 discrimination.

83. The settlement of the NFHA Lawsuit did not require Facebook to alter its ad delivery system.

84. In 2018, Facebook recognized that the company's use of the Personalization Algorithms involved disparate treatment and that both the Personalization Algorithms and Lookalike Audience tool raised disparate impact concerns. Facebook was aware that even if it removed protected characteristics from advertiser targeting options and the Lookalike Audience tool, Facebook's Personalization Algorithms would simply reintroduce this bias in delivering the ads.

85. Testing has demonstrated that, even when advertisers do not employ discriminatory targeting options, Facebook's Personalization Algorithms nonetheless steer certain housing ads disproportionately to White users and away from Black users, and vice versa.

86. For example, researchers who conducted testing of Facebook's Personalization Algorithms found, in the course of their testing, that, as a general matter, housing ads featuring an image of a Black family were less likely to be delivered to White users than were identical ads featuring an image of a White family. That disparity occurred even though the researchers did not try to target the ads by race or any other characteristics.

87. The United States has conducted extensive testing of Facebook's Personalization Algorithms in a number of housing markets. That testing showed that Facebook's Personalization Algorithms steer certain housing ads disproportionately away from Black users and toward similarly situated White users.

88. In one set of tests, the United States compared Facebook's delivery of real, randomly selected ads for single-family homes located in two adjacent towns in the Southern

District of New York that have different racial makeups and housing prices. More than 60% of residents in one town were African-American, while the other town was more than 90% White.

89.     The United States placed more than 150 ads directed to an audience of users in the Southern District who lived near (but not in) these towns. In constructing the Eligible Audience, the United States included equal numbers of Black and White residents who were similarly situated as to income, sex, and age. Facebook, using its Personalization Algorithms to predict which users would be interested in the ads, delivered these ads more than 80,000 times.

90.     Though the users in the Eligible Audience were similarly situated with respect to income, sex, age, and location, Facebook steered the ads for housing opportunities in the majority-White town disproportionately toward White users and away from Black users; conversely, Facebook steered the ads for housing opportunities in the majority-Black town disproportionately toward Black users and away from White users. The steering was substantial and highly statistically significant. The United States conducted additional testing that further demonstrated that the racial disparities in the ad delivery were not driven by users' specific, expressed interest in living in one of the two towns.

91.     By steering ads for housing in majority-White neighborhoods disproportionately to White users and steering ads for housing in majority-Black neighborhoods disproportionately to Black users, Facebook's Personalization Algorithms actually and predictably reinforce or perpetuate segregated housing patterns because of race.

92.     The United States also conducted similar and complementary testing in neighborhoods outside the Southern District of New York. This testing, which controlled for sex, age, and income, showed statistically significant racial disparities in Facebook's ad delivery.

93.     Facebook's use of the Personalization Algorithms to help determine which users

receive housing-related ads intentionally discriminates based on FHA-protected characteristics. Facebook accomplishes this discrimination by:

    a.   inputting into its Personalization Algorithms a massive amount of user data that relates to users' FHA-protected characteristics;

    b.   failing to implement technical measures to prevent its Personalization Algorithms from making determinations based, in part, on FHA-protected characteristics;

    c.   failing to correct the output of its Personalization Algorithms for decision-making on the basis of FHA-protected characteristics;

    d.   training its Personalization Algorithms on user data tainted by expressly discriminatory targeting options previously offered by Facebook to housing advertisers; and

    e.   failing to remove or cure historical user data tainted by discriminatory ad delivery.

94.     Facebook's design and implementation of its Personalization Algorithms have an unlawful disparate impact on users' opportunity to see housing-related ads, at least based on race. The way Facebook designed and uses its Personalization Algorithms in connection with housing-related ads—including insufficient limits on the types of data the Personalization Algorithms can or should consider, and the insufficient supervision or corrections of the algorithms' actions—is neither justified by business necessity nor necessary to achieve any substantial, legitimate, nondiscriminatory interests. Even if it were, Facebook could achieve its interests in maximizing its revenue and providing relevant ads to users through less discriminatory means.

### III. HUD's Investigation and Charge of Discrimination

95.     HUD's Office of Fair Housing and Equal Opportunity opened an investigation into Facebook's ad delivery system.

96.     On August 13, 2018, the Assistant Secretary for Fair Housing and Equal Opportunity filed a timely administrative complaint with HUD alleging that Facebook's ad delivery system violated the FHA.

97.     HUD investigated the administrative complaint in accordance with 42 U.S.C. § 3610(a)-(b).

98.     Based on HUD's investigation of the administrative complaint, the Secretary determined that there was reasonable cause to believe that Facebook's ad delivery system discriminates on the basis of protected characteristics in violation of the FHA.

99.      On March 28, 2019, the Secretary issued a Charge of Discrimination under 42 U.S.C. § 3610(g)(2), charging Facebook with engaging in a discriminatory housing practice in violation of the FHA.

100.    On April 16, 2019, Facebook timely elected to have the charge decided in federal district court in accordance with 42 U.S.C. § 3612(a).

101.    Facebook agreed to toll the statute of limitations in which to file a Complaint, to June 21, 2022.

### COUNT I – DISCRIMINATION ON THE BASIS OF PROTECTED CHARACTERISTICS

102.    The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

103.    Facebook's actions, policies, and practices, as alleged herein, constitute:

a.  Making dwellings unavailable to persons because of race, color, religion, sex, disability, familial status, or national origin in violation of the Fair Housing Act, 42 U.S.C. § 3604(a) and (f), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(3)-(5) and 100.70(a).

b.  Making, printing, or publishing, or causing to be made, printed, or published, advertisements with respect to the sale or rental of dwellings that indicate a preference, limitation, or discrimination based on race, color, religion, sex, disability, familial status, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(c), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(4), 100.70(a), and 100.75(a)-(c).  Facebook, through each of the three challenged aspects of its ad targeting and delivery system, targets and delivers housing-related ads to some users while depriving other users based on FHA-protected characteristics or their proxies.  Those acts and practices constitute "[s]electing media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin," as well as "[r]efusing to publish advertising for the sale or rental of dwellings . . . because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R. § 100.75 (HUD regulation implementing FHA).

c.  Representing to a person because of race, color, religion, sex, disability, familial status, or national origin that a dwelling "is not available for inspection, sale, or rental when such dwelling is in fact so available," in

violation of the Fair Housing Act, 42 U.S.C. § 3604(d), and its implementing

regulations, 24 C.F.R. §§ 100.50(b)(5), 100.70(a), and 100.80(a)-(b).  Such

unlawful conduct by Facebook, through its ad delivery system, includes

"[l]imiting information, by word or conduct, regarding suitably priced

dwellings available for inspection, sale or rental, because of race, color,

religion, sex, handicap, familial status, or national origin."  24 C.F.R. §

100.80(b)(4) (HUD regulation implementing FHA).

104.    In committing the violations alleged in paragraph 103, Facebook:

a.    Intentionally discriminated on the basis of race, color, religion, sex, disability,

familial status, and national origin by encouraging, facilitating, and knowingly

implementing the intentionally discriminatory decisions of advertisers to

exclude users from the Eligible Audience on the basis of FHA-protected

characteristics;

b.    Acted with deliberate indifference to the intentionally discriminatory

decisions of advertisers to exclude users from the Eligible Audience based on

their race, color, religion, sex, disability, familial status, and/or national

origin;

c.    Intentionally made the following data available to its Personalization

Algorithms for use in determining ad delivery: (1) information about

Facebook users' race, color, religion, sex, disability, familial status, and/or

national origin, and (2) data about Facebook users that served as a proxy for,

or was closely related to, those FHA-protected categories;

d.  Implemented its ad delivery system in a manner that has disproportionately excluded certain Facebook users from receiving housing ads based on FHA-protected characteristics;

e.  Implemented its ad delivery system in a manner that actually or predictably creates, increases, reinforces, or perpetuates segregated housing patterns because of FHA-protected characteristics; and

f.  Acted with deliberate indifference to the racially disparate impact and segregative effect caused by its Personalization Algorithms, despite knowing that machine-learning tools, including its algorithms, at least are susceptible to unlawful actions or outcomes and despite knowing that the data Facebook made available to the algorithms contained FHA-protected characteristics or their proxies and was tainted by intentional discrimination that occurred prior to September 2019.

## COUNT II – PATTERN OR PRACTICE OF DISCRIMINATION
## AND A DENIAL OF RIGHTS TO A GROUP OF PERSONS

105.     The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

106.     Persons who have been victims of Facebook's discriminatory policies and practices are aggrieved as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of Facebook's conduct in violation of the Fair Housing Act, as described above.

107.     The conduct of Facebook as described above constitutes:

A.     A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act, 42 U.S.C. § 3614(a); and/or

B.     Unlawful discrimination and a denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general public importance within the meaning of 42 U.S.C. § 3614(a).

## REQUEST FOR RELIEF

WHEREFORE, the United States requests that the Court enter an order that:

1.     Declares that the conduct of Facebook violates the Fair Housing Act;

2.     Enjoins Facebook, its agents, employees, successors, and all other persons in active concert or participation with it from:

a.     Discriminating on the basis of FHA-protected characteristics in connection with the delivery of housing advertisements;

b.     Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Facebook's unlawful

practices to the position they would be in but for Facebook's discriminatory conduct;

      c.      Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct regarding the delivery of housing ads in the future and to eliminate, to the extent practicable, the effects of Facebook's unlawful practices; and

      d.      Discriminating through the adoption of policies and procedures that do not ensure all segments of Facebook's users are served housing ads without regard to FHA-prohibited characteristics;

      3.      Awards monetary damages against Facebook in accordance with 42 U.S.C. § 3614(d)(1)(B);

      4.      Assesses a civil penalty against Facebook in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

      5.      Awards the United States any additional relief as the interests of justice may require.

The United States demands trial by jury.

Dated:      New York, New York
                June 21, 2022


MERRICK B. GARLAND
Attorney General

KRISTEN CLARKE                                DAMIAN WILLIAMS
Assistant Attorney General              United States Attorney for the
Civil Rights Division                      Southern District of New York

SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement Section

R. TAMAR HAGLER                         By: _____
Deputy Chief                                   ELLEN BLAIN
JUNIS L. BALDON                        DAVID J. KENNEDY
HARIN C. SONG                         JACOB LILLYWHITE
KINARA A. FLAGG                       CHRISTINE S. POSCABLO
Trial Attorneys                           Assistant United States Attorneys
Housing and Civil Enforcement Section     86 Chambers Street, 3rd Floor
Civil Rights Division                    New York, New York 10007
U.S. Department of Justice              Tel.: (212) 637-2733
950 Pennsylvania Avenue NW – 4CON     david.kennedy2@usdoj.gov
Washington, DC 20530
Tel.: (202) 353-1339
Fax: (202) 514-1116